UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 23-cr-20165

UNITED STATES OF AMERICA

vs.

TYLER OSTERN,

    **Defendant.**
_____/

## PLEA AGREEMENT

  The United States Attorney's Office for the Southern District of Florida and the Fraud Section of the Criminal Division of the Department of Justice (together the "United States" or the "Government") and TYLER OSTERN (hereinafter referred to as "Defendant") enter into the following agreement:

  1. Defendant agrees to plead guilty to Count 1 of the Information, which count charges Defendant with conspiracy, in violation of Title 18, United States Code, Section 371, to commit: wire fraud, in violation of Title 18, United States Code, Section 1343 and manipulation of securities prices in violation of Title 15, United States Code, Sections 78i(a)(1) & (2). Defendant agrees and understands that this charge involves Defendant's conduct from in or around October 2018 through in or around April 2019, during which time Defendant and his co-conspirators conspired and agreed to manipulate the price of the Hydro Token ("HYDRO") through, among other things, false and misleading orders for HYDRO, including wash trades and spoof orders as described below, intended to deceive other market participants about the market's supply and demand for HYDRO, fraudulently induce other market participants to purchase HYDRO, and artificially inflate the price of HYDRO so that Defendant and his co-conspirators could sell HYDRO at such artificially inflated prices. The plea entered by Defendant pursuant to this agreement resolves Defendant's federal criminal liability in the Southern District of Florida from

2

Defendant's criminal conduct described in the Factual Proffer contained herein, as known to the United States Attorney's Office for the Southern District of Florida and the Fraud Section of the Criminal Division of the Department of Justice, as of the date of this plea agreement.

2. Defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). Defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. Defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed and may raise or lower that advisory sentence under the Sentencing Guidelines. Defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, Defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that Defendant may not withdraw the plea solely as a result of the sentence imposed.

3. Defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to five (5) years, followed by a term of supervised release of up to three (3) years. In addition to a term of imprisonment and supervised release, the

3

Court may impose a fine of up to double the gross gain or gross loss, or $250,000 (whichever is greater), and must order forfeiture and restitution.

4. Defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100 will be imposed on Defendant. Defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If Defendant is financially unable to pay the special assessment, Defendant agrees to present evidence to the Government and the Court at the time of sentencing as to the reasons for Defendant's failure to pay.

5. The United States reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning Defendant and Defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, the United States further reserves the right to make any recommendation as to the quality and quantity of punishment.

6. The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to Defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon Defendant's recognition and affirmative and timely acceptance of personal responsibility. If, at the time of sentencing, Defendant's offense level is determined to be 16 or greater, the United States will file a motion requesting an additional one-level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that Defendant has assisted authorities in the investigation or prosecution of Defendant's own misconduct by timely notifying authorities of Defendant's intention to enter a plea of guilty,

4

thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The United States, however, will not be required to make this motion and this recommendation if Defendant: (1) fails or refuses to make a full, accurate, and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7.     Defendant agrees that he shall cooperate fully with the United States by: (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by the Government, whether in interviews, before a grand jury, or at any trial or other Court proceeding; (b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by the Government; and (c) if requested by the Government, working in an undercover role under the supervision of, and in compliance with, law enforcement officers and agents. In addition, Defendant agrees that he will not protect any person or entity through false information or omission, that he will not falsely implicate any person or entity, and that he will not commit any further crimes.

5

8. The United States reserves the right to evaluate the nature and extent of Defendant's cooperation and to make that cooperation, or lack thereof, known to the Court at the time of sentencing. If, in the sole and unreviewable judgment of the Government, Defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the advisory sentencing range calculated under the Sentencing Guidelines, the Government may make a motion prior to sentencing pursuant to Section 5K1.1 of the Sentencing Guidelines or Title 18, United States Code, Section 3553(e), or subsequent to sentencing pursuant to Rule 35 of the Federal Rules of Criminal Procedure, informing the Court that Defendant has provided substantial assistance and recommending that Defendant's sentence be reduced. Defendant understands and agrees, however, that nothing in this agreement requires the Government to file any such motions, and that the Government's assessment of the quality and significance of Defendant's cooperation shall be binding as it relates to the appropriateness of the Government's filing or non-filing of a motion to reduce sentence.

9. Defendant understands and acknowledges that the Court is under no obligation to grant a motion for reduction of sentence filed by the United States. In addition, Defendant further understands and acknowledges that the Court is under no obligation of any type to reduce Defendant's sentence because of Defendant's cooperation.

10. The United States and Defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

6

(1). <u>Loss</u>: That the relevant loss under Section 2B1.1(b)(1) of the Sentencing Guidelines resulting from the offense committed in this case is approximately $1,300,000.

(2). <u>Role in the offense</u>: The parties do <u>not</u> have an agreement as to the applicability of an adjustment for Defendant's role in the offense, pursuant to Section 3B1.2 of the Sentencing Guidelines.

(3). <u>Sophisticated Means</u>: The parties do <u>not</u> have an agreement as to the applicability of an adjustment for sophisticated means, pursuant to Section 2B1.1(b)(10)(C) of the Sentencing Guidelines.

11. The United States and Defendant stipulate to, and agree not to contest, the facts in the following Factual Proffer, and stipulate that such facts, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure, provide sufficient factual basis for the plea of guilty in this matter. Because the factual basis set forth in the Factual Proffer has the limited purpose of supporting Defendant's guilty plea to the charge cited in paragraph 1, the Factual Proffer does not purport to represent all facts and circumstances relating to Defendant's participation. The Factual Proffer is as follows:

If this case had proceeded to trial, the United States would prove beyond a reasonable doubt that beginning in or around October 2018 and continuing through in or around April 2019, Defendant knowingly conspired and agreed with others to manipulate the price of HYDRO.

Defendant was the President and CEO of Moonwalkers Trading Limited, an entity organized in the country of South Africa. In that capacity, Defendant, and his co-conspirators at Moonwalkers, designed a trading software "bot" to execute automated trading strategies for

7

trading HYDRO on Bittrex, Inc. ("Bittrex"), a crypto-asset trading platform headquartered in Seattle, Washington. HYDRO was an ERC-20 token created by Hydrogen Technology Corporation, a privately-held corporation whose primary business between October 2018 and April 2019 was centered on its application programming interface ("API") solution, which Hydrogen Technology's clients, mainly banks and other financial institutions, paid Hydrogen to use in order to access the company's data models for account and portfolio management. Hydrogen Technology also purported to be developing a blockchain-based software ecosystem called the "Hydrogen platform" on which it would release so-called "Hydro protocols" (e.g., Snowflake, a decentralized, block-chain based two-factor authentication smart contract developed by Hydrogen), which users would ostensibly use by paying with or staking HYDRO. Defendant, and his co-conspirators at Moonwalkers, agreed to, and in fact did, use the bot to place false and fraudulent buy and sell orders for HYDRO on Bittrex.

Defendant, and his co-conspirators, agreed to, and did in fact, use the bot to place thousands of orders to buy or sell HYDRO on Bittrex that Defendant, and his co-conspirators, knew at the time were not placed with a legitimate intent to buy or sell HYDRO but were intended to send false and misleading information to other market participants about the market's supply and demand for HYDRO, deceive other market participants about the same, and fraudulently induce other market participants to buy or sell HYDRO (collectively, "Spoof Orders"). Defendant knew at the time that such Spoof Orders were unlawful.

Defendant, and his co-conspirators, also agreed to, and did in fact, use the bot to execute at least 1,700 orders for HYDRO that involved no change in the beneficial ownership of HYDRO because Defendant, and his co-conspirators, caused the bot to execute orders with itself as both

8

the buyer and seller of HYDRO in pre-arranged transactions through the Bittrex account in the name of Michael Kane (collectively, "Wash Trades"). Like the Spoof Orders, Defendant, and his co-conspirators, knew at the time that the Wash Trades were intended to send false and misleading information to other market participants about the market's supply and demand for HYDRO, deceive market participants about the same, and fraudulently induce other market participants to buy or sell HYDRO. Defendant knew at the time that such Wash Trades were unlawful.

Defendant coordinated the bot's execution of both the Spoof Orders and Wash Trades with individuals at Hydrogen Technology, including with Michael Kane, who was the co-founder and CEO of Hydrogen Technology, Shane Hampton, who was the Head of Financial Engineering at Hydrogen Technology, and Andrew Chorlian, who was a Blockchain Engineer at Hydrogen Technology. Defendant regularly updated Kane, Hampton, and Chorlian about the status of his use of the bot to manipulate the price of HYDRO on Bittrex. Defendant also coordinated the bot's execution of the Spoof Orders and Wash Trades with George Wolvaardt, who was the Chief Technology Officer at Moonwalkers.

Defendant and his co-conspirators, both at Moonwalkers and Hydrogen Technology, used the Spoof Orders and Wash Trades so that Defendant and his co-conspirators could sell HYDRO at artificially inflated prices. For manipulating the price of HYDRO in this way, co-conspirators at Hydrogen Technology caused Defendant and George Wolvaardt to be paid in Bitcoin.

During the relevant period, HYDRO was an unregistered security as defined by 15 U.S.C. § 78c(a)(10). Defendant knew and understood that holders of HYDRO had invested money to obtain the token either because they received HYDRO in exchange for providing their services to

9

Hydrogen Technology as developers and marketers or in exchange for fiat money and other digital assets on Bittrex and other secondary markets.

Defendant also knew and understood that holders of HYDRO had invested their money in a common enterprise because their fortunes would communally rise and fall with the value of the token and the success of Hydrogen Technology. More specifically, Defendant knew that HYDRO investors' fortunes were tied to each other, because if HYDRO increased in value, all investors would share in that increased value on a *pro rata* basis. Defendant also knew that HYDRO investors had a common interest in the growth of Hydrogen Technology and its development of blockchain technology that used HYDRO, which would increase the demand for and thus the value of the limited supply of HYDRO.

Finally, Defendant knew and understood that holders of HYDRO expected to reap financial returns based on the efforts of others—namely, Defendant's co-conspirators at Hydrogen Technology. Defendant frequently participated in online forums focused on Hydrogen Technology and HYDRO and knew that other HYDRO investors closely monitored every public statement made by his co-conspirators at Hydrogen Technology regarding their development and management of the company. Defendant knew and understood that HYDRO investors were relying on his co-conspirators at Hydrogen Technology to continue to develop uses and demand for HYDRO, which could increase the value of HYDRO. Defendant also knew and understood that the ability of HYDRO investors to profit from the token depended, in part, on the efforts of his co-conspirators at Hydrogen Technology to get HYDRO listed on crypto asset exchanges. As a result, Defendant sought updates from his Hydrogen Technology co-conspirators regarding their efforts to develop and market their blockchain-based products and encouraged his co-conspirators

10

to coordinate Hydrogen Technology's announcements with him because he knew such efforts and communications would be seen by other HYDRO investors, thereby increasing demand for, and thus the value, of HYDRO.

To execute the Spoof Orders and Wash Trades, Defendant, and his co-conspirators, used interstate wires and communications and caused interstate wires and communications in furtherance of the scheme to be transmitted to, from, and through the Southern District of Florida. For instance, beginning in or around January 2019, Michael Kane began residing in Miami, Florida, and he subsequently transmitted numerous interstate wires and communications in furtherance of the scheme from the Southern District of Florida. In addition, Defendant, and his co-conspirators, caused interstate wires and communications to be transmitted to the Southern District of Florida by executing electronic transactions for the sale of HYDRO from locations in Minnesota and New York with individuals who resided in the Southern District of Florida at the time of the transactions.

From in or around October 2018 through April 2019, Defendant's manipulation of the price of Hydro caused his co-conspirators at Hydrogen Technology to realize profits of at least $1.3 million from the sale of HYDRO at artificially inflated prices.

12. In the event that for any reason Defendant withdraws from this agreement prior to or after pleading guilty to the charge identified in paragraph 1 above, or should the Government, in its sole discretion, determine that Defendant failed to fully comply with any of the provisions of this agreement, Defendant agrees and understands that he will forego the benefits and concessions contained in this plea agreement, and waive any protection afforded by Section 1B1.8 of the Sentencing Guidelines, as well as any protection afforded by Federal Rules of Criminal

11

Procedure 11(f) and Federal Rule of Evidence 410. Defendant further understands that in the event that for any reason he does not plead guilty, the Factual Proffer and any other statements made previously by Defendant under this agreement or as part of any plea discussions, will be fully admissible against him in any civil or criminal proceedings, notwithstanding any prior agreement with the Government.

13. Defendant also agrees to fully cooperate with the Government in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all rights, title, and interest, regardless of their nature or form, in all assets, including real and personal property, cash and other monetary instruments, wherever located, which Defendant or others to Defendant's knowledge have accumulated as a result of illegal activities. Such assistance will involve Defendant's agreement to the entry of an order enjoining the transfer or encumbrance of assets that may be identified as being subject to forfeiture. Additionally, defendant agrees to identify as being subject to forfeiture all such assets, and to assist in the transfer of such property to the United States by delivery to the Government upon the Government's request, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quit claim deeds and any and all other documents necessary to deliver good and marketable title to said property.

14. Defendant knowingly and voluntarily waives all constitutional, legal, and equitable defenses to the forfeiture of the assets in any judicial or administrative proceeding, including any claim or defense under the Eighth Amendment to the United States Constitution; waives any applicable time limits to the initiation of administrative or judicial proceedings, and waives any right to appeal the forfeiture.

12

15. Defendant further agrees that forfeiture is independent of any assessments, fines, costs, restitution orders, or any other penalty that may be imposed by the Court. The United States agrees that it will not seek forfeiture in this case so long as Defendant fully complies with the terms of his disgorgement in the amount of $41,868, as adjudicated in the September 29, 2022 Judgment in *United States Sec. & Exchange Comm. v. Ostern*, 22-cv-08284-LAK-SDA (S.D.N.Y.). Defendant understands that the Court will set the amount of restitution at the time of sentencing and understands that the amount of restitution may exceed the amount of Defendant's personal gain from the conspiracy.

16. Defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford Defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, Defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing. Defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b) and Title 28, United States Code, Section 1291. However, if the United States appeals Defendant's sentence pursuant to Sections 3742(b) and 1291, Defendant shall be released from the above waiver of appellate rights. By signing this agreement, Defendant acknowledges that Defendant has discussed the appeal waiver set forth in this agreement with Defendant's attorney. Defendant further agrees, together with the United States, to request that

13

the Court enter a specific finding that Defendant's waiver of his right to appeal the sentence imposed in this case was knowing and voluntary.

17. This is the entire agreement and understanding between the United States and Defendant. There are no other agreements, promises, representations, or understandings.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF, FRAUD SECTION

Date: 5/30/2023        By: *Andrew Jaco*
                            Scott Armstrong
                            Assistant Chief

                            Andrew Jaco
                            Trial Attorney

Date: 05-30-23         By: *[signature]*
                            Eric E. Morales
                            Assistant U.S. Attorney

Date: 30 May 2023      By: *[signature]*
                            MICHAEL R. BAND
                            ATTORNEY FOR DEFENDANT

Date: 5/30/23          By: *[signature]*
                            TYLER OSTERN
                            DEFENDANT